The next case for argument this morning, Industrial Park Center v. Great Northern Insurance Company, two appeals that are consolidated 24-4788 and 25-295. Counsel, whenever you're ready, please proceed. Good morning, Your Honors. May it please the Court, my name is Larry Charlotte, and I represent the appellant plaintiff in this case, Mainspring Capital Group. Judge Beatty, I would respectfully request a couple minutes for a rebuttal. Okay. Well, please keep your eye on that clock. I will. Your Honors, the focal issue here today on this appeal is the interpretation and applicability of the fortuity doctrine in Arizona. We know this. Courts all over the country have addressed this issue. Unfortunately, the Arizona Supreme Court has not, neither has the Court of Appeals, and so this panel is blessed with a case of first impression. That leads to a question in my mind that I'd appreciate having both counsel respond to. Given the centrality of this issue of state law on which the state appellate courts have not issued any opinion, is this an appropriate case for certification to the Arizona Supreme Court? I think it may be, and it's my understanding that the Court of Appeals, I believe it's Rule 27, has the authority to do that. I don't believe that counsel can certify it, but yes, to answer your question correctly. No, counsel can't, nor do we need a request from counsel, but I'm asking more for your views as to whether that would be useful or appropriate. It would certainly be more definitive in Arizona if the Arizona Supreme Court sets out what the interpretation and appropriate application of the fortuity doctrine is, because with all due respect, if there's a federal decision on the interpretation, it's not going to be necessarily binding on the state courts. Well, it's certainly not going to be binding on the Arizona Supreme Court, so is there enough developed law for us to make what we would call an eerie guess? There is, as the Court is aware of, a boatload of law on fortuity. I do think that certainly an educated guess can be made by the federal court. It's just a matter of binding authority is really my point. You're going to see that with the Arizona Supreme Court. With this court, it won't necessarily be binding, obviously, on the Arizona Supreme Court. So I guess one of the countervailing considerations is, of course, first they don't have to accept it, but also delay. So if we can make a decision that resolves the case, should we not do so? Well, in representation of the plaintiff, we want as expeditious a ruling as possible. And my preference would be, I gave you my reasons why I think the Arizona Supreme Court might be the better forum for something that is binding throughout Arizona. My preference would be to have this court decide this issue. I have a factual question as well, and that is whether this insurer, whether Great Northern was the insurer at the time of the 2010, what I'll call, flooding disaster or flood or whatever. Because clearly they have insured from 2018 through 2022, which is five years, but I'm unclear as to whether they were the insurer at the time of the 2010 issue. GNIC, Great Northern, was the insurer initially in 2008 and 2010 and 2011, and as Judge Graber, you pointed out, 2018 through 2022. I'm sorry to interrupt, but the reason I'm asking is to understand whether they knew of the problem in 2010 by way of being the insurer or in some other way, and specifically whether they knew of the extent of the problem and the likelihood of its repetition if the use of the property remained the same. Your Honor, S.E.R. 144 is where the deposition of Barb McDaniel, who was the property manager at Main Spring for all those years that we talked about, and specifically your testimony at S.E.R. 159-160 specifically states, under oath deposition, that each and every one of those years GNIC would come and inspect the property, obviously to determine the insurability of it, each and every year. So 2008, obviously, 2010, 2011. Had there a claim been made at that time when the 2010 occurred? It was not, because it had been paid for by Star Fisheries, the $56,000 in damages, and that is really one of the... Well, that's actually the source of my question, because if someone else paid for it, what does the record show about the extent to which the insurer was made aware of all the specifics of the actual physical problems and what might happen or would happen in the future? As far as the record goes, what I provided you is where they would have obtained that information. If they were there in 2010 and there in 2011, inspecting GNIC, that is. And I would also add... So there's nothing showing that they received copies of the reports or of the repairs that were made in 2010? Not in the record. Okay. Not in the record. But I would also note that in that SER, those numbers I gave you, SER 159 to 160, Ms. McDaniel also testified that specifically they would look at the Star Fisheries suite. So there's that. Turning toward the issue of fortuity, it's a somewhat amorphous standard. There needs to be some chance involved, some risk for something to be insurable. I understood the district court's order to apply a standard very close to whether it was reasonably foreseeable, whether the event or the damage was foreseeable. That would make it outside of non-fortuitous and not something that could be covered. And the district court relied on the change in the lease with Star Fisheries. And I'm forgetting what else it was in the record, but the district court relied on a few things to conclude that that Mainspring was aware of this issue and basically knew it was going to happen or it was foreseeable it was going to happen. Why is that wrong? Well, where do I start? In all ways, I'm sure you're going to say, Ben. You can go a lot of directions here. First, with respect to the court's decision with respect to applying a standard of reasonable foreseeability, and importantly, it applied a standard of almost certain to occur. There is no jurisdiction, no case in this country, and fortuity has been around for 60 years, that applied a standard of almost certain. And that's significant because almost certain implies risk. There's some type of risk, whether it's high or low. That is why the majority of courts, including, by the way, in Janco, which is what the trial court relied upon, required in their analysis, and they found that it was fortuitous, that particular loss. It has to be certain. And not only does it have to be certain, the insured has to subjectively know that it's going to be certain to occur within the policy period. I know I remember what the other bit of the record was, that Mainspring had had a report prepared in 2010. They took some of the recommended steps, but not others, that would have hopefully prevented this from happening. Okay, I've got five minutes. I could talk for 20 about just that question. The court relied, I just want to stay with this Janco standard, reasonably foreseeable. If you think about that standard, first of all, Janco is one of four cases in this country that applies reasonable foreseeability. All of them are out of one state, Washington. All of those four cases, as I indicated a moment ago, require certainty. The insured has to know with certainty, not almost certainty, which is what the trial court held and applied, and it was the wrong standard. Third, all four of these cases, the Janco cases out of Washington, all require a subjective standard, all of them. And the court's ruling, the court found initially in that one paragraph, I believe it's ER7, the court finds that Mainspring didn't know this was going to happen. And they certainly did nothing intentionally. Nevertheless, the court finds that this was reasonably foreseeable and almost certain. That's an objective standard. All of those cases under Janco require subjective and certainty. The last thing I would point out about the Janco and the reasonable foreseeability standard, again, there's not one case in this country, at least that I'm aware of, where a court has actually held that a loss was non-fortuitous, not fortuitous because the insured merely thought the loss was reasonably foreseeable and almost certain. The law of fortuity is a threshold issue to prevent wrongdoing, where the insured knows when it enters that contract, it knows with certainty that I'm going to have a loss in this policy period, I'm going to get paid off. That's not what insurance law is about. Insurance law is about risk. And that's why the courts throughout the country have applied it's got to be certain. There's no evidence in this case that it was certain. Getting to the other part of your question, the trial judge referred to that restoration clause. That clause was put in place in 2014 with Star Fisheries as a direct result of repairs that had to be done in 2011. And it was put there because, dare I say, Main Springs made up of some smart business people. There was a risk, not a certainty. And that's critical fortuity. Fortuity, again, is just that threshold issue. It's not about coverage. If there is risk that's involved, the insurance company, they cover it. That's what insurance law is based upon. Secondly, if you look at the restoration clause to put an exclamation point on risk, what that restoration clause said was, look, at the end of your lease, because they had to make repairs in 2011, we're going to have engineers look at it and make sure that everything's copacetic, if you will, before you leave. Third, again, certainty. Not almost certainty. The Main Springs amended the lease with Star Fisheries, as I said. The first time that restoration clause was 2014. They did it again in 2018. And this is in the SCR records, all the amendments. And they did it two other times, up to the 13th Amendment, which was during the timeframe of the loss. And, again, the standard for fortuity around the country is the insured has to know that if the loss is going to occur, for all the reasons I stated before, within that policy period, for a loss to be not fortuitous. They clearly didn't know with any type of certainty that this loss was going to occur between June 7th, 2021 and June 7th, 2022, the relevant timeframe, because they kept renewing it. If they knew for certain, if that was the case, and, by the way, if they really knew for certain that this was going to happen, they would have gotten rid of this tenant. That's more or less Mr. Charlotte's commentary on it. There's no statement about that. And the last thing on this point would be think about setting a standard of reasonable foreseeability for fortuity. That would mean virtually all insurance is illusory. And the reason for that is we, as individuals, we only insure that which is reasonably foreseeable. We're not going to get earthquake insurance in Phoenix, likely not. But we sure as heck, because it's reasonably foreseeable, are going to get auto insurance. Because it's reasonably foreseeable, we're going to get an accident. Homeowner's insurance, same thing. It's reasonably foreseeable. We're going to have a pipe. And if we're going to set the standard on fortuity, on reasonable foreseeability, then virtually any type of claim is going to be considered not fortuitous and it would be illusory. I could reserve my last 10 seconds. Are there any other questions? If my colleagues have no additional questions, I'll give you a couple of minutes on rebuttal. Thank you. Or you can talk really fast for 10 seconds. Thank you. Good morning. And may it please the Court, Douglas Caudill, a parent on behalf of Great Northern Insurance Company. I think we start with the panel's threshold question about potentially certifying this matter over to the Arizona Supreme Court. Although that would provide certainty on the issue in Arizona and specifically defining Arizona law, this court in Ingenco made the same analysis about fortuity under Washington law. And so it's our position that your honors are well equipped to make the determination in this case. Circling around to then what is fortuity, and we think that the district court was spot on in the assessment of what is necessary for fortuity. There has to be some kind of a chance. There has to be some kind of an unexpected event that is tethered to the actual loss. And in this case, we have a manifestation of that loss back in 2010, well before this policy, particular policy, incepted. And we have Mainspring correcting the damage to it, having its tenant contribute to the payment for that damage. And this is an ongoing issue that the, excuse me, to pay for the water-related damage. And the water-related issue is ongoing for many, many years. So Mainspring knew about the condition and what it could cause and had evidence from its inspectors that there was chipping and issues with the tilt walls that are associated with water, with water damages. So we have not a focus on the cause of the loss, because we know what the cause of the loss is, but whether the loss itself is fortuitous. And so for guidance to this court, as in NGENCO, the restatement of contracts is really the focal point that courts around the country have honed in on. And under the restatement of contracts, courts typically define a fortuitous event as one that depends on chance, taking into account the knowledge of the parties, and the perception of the risk at the time the policy was issued, and whether the loss could be reasonably foreseen. And so the restatement itself is where the district court was able to get its standard for this case. So how do we draw some lines here? Your friend on the other side argues that if reasonable foreseeability is the standard for a fortuity, then nothing is insurable, because almost every loss is foreseeable, reasonably foreseeable. So is there some line drawing that we can do here? Well, again, reasonable foreseeability, yes, there are on clear days, everything is foreseeable. But going to the examples that counsel used about auto insurance, well, getting auto insurance is not illusory simply because it's reasonably foreseeable that you might get into an accident. It's insuring against an unexpected event. The risk of that unexpected event. Now, you may purchase auto insurance for 30 years and never have to make a claim. And so it's not an illusory contract with the insured. But it would be illusory if you took out the insurance and you intended to use your vehicle for bumper cars. I mean, then you're certain you're going to damage the vehicle as opposed to you're going to drive it. Well, it wouldn't be illusory, but I would say it would not be covered because taking out insurance, auto insurance, and then using your car as a bumper car, it would be reasonably foreseeable to an almost certainty that using your car as a bumper car would cause damage to the car. So is fortuity a doctrine that's intended to prevent essentially insurance fraud? So you can't take out a policy when you know you not only foresee a risk or damage, you know what's going to happen. And so you're taking out insurance when there's really no risk at all and you're just trying to shuffle your ability to the insurance company. That's the overarching policy behind the fortuity doctrine that's embedded in every insurance contract is you don't want to be insuring or providing insurance for something that is going to happen or is reasonably likely to happen because then you're encouraging fraud in terms of people making claims when they know something is going to happen or is reasonably foreseeable to happen. So, yes, that's the undergirding for the policy behind the fortuity doctrine. So if I understand your argument, Mainspring knew this was going to happen so there's no fortuity because there had been past damage to the building in 2010 from the water. They made repairs. They retained the same tenant and the tenant had the same practices with respect to washing down the floors. So because it had occurred in the past, they knew it was going to happen again? Because it had occurred in the past, they had these reports that indicated that you needed to take action against, to protect against further water damage, otherwise you would have structural issues and that's exactly what happened. So in a way, yes, it was reasonably foreseeable based on the knowledge that Mainspring had and the knowledge that it needed to do things to prevent the inevitability from occurring and did not do those things that it was reasonably foreseeable that this event would occur. That seems to track what Njenko holds, which I gather is what you want us to apply here. The quote saying, while in hindsight structural defects might appear inevitable, the court had to credit the insured statement that it had no knowledge of the design defects and therefore the loss was fortuitous. So I guess by negative implication, if the insured had knowledge of the design defects or other problems, it would not have been fortuitous. At least that's how I read Njenko. And it's very fact-dependent. So I guess my next question really is, even if we apply that standard, are there genuine issues of fact here that require a trial? No, Your Honor, there aren't. As the district court found, the parties agreed on the basic facts which provide the basis to make the fortuity determination. And those are the long history, the reports, the failure to make the repairs, and the ongoing water damage over 30 years. What about the inspections? What about Great Northern's inspections of the building in 2010-2011 and their ability to determine these issues? I'm sorry, Your Honor, I didn't quite hear you. Oh, I'm sorry. Did Great Northern have any ability to determine that there were potential issues with respect to the use of water at the building because they had done inspections around the time of the previous damage in 2010 and 2011? There's no evidence in the record that Great Northern had any information relating to, you know, the specific underlying nature of the water issues. As Judge Holman noted or asked about, there was no claim made. So the type of inspection that might be done going out to a property and looking around saying, okay, you know, the Star Fisheries is here. They're still doing the same thing. You know, has anything changed? And the insurer doesn't inform the underwriters about any change in circumstances. So there's nothing in the record that Great Northern was aware of the issues that were going on for a good 12 years. Can you identify the changes that Mainspring did not make that the engineers suggested be made in 2010? Give me a second. Sure.  Speedy recommended that it may be possible to install neutral waterproof floor coating or remove or replace large sections of the slab with a vapor barrier or drain system to collect water and prevent infiltration into the deeper soils. Those are the ones, specific ones, Your Honor. And Mainspring admitted that they did not make those changes. So they received a report that recommended a number of steps. They took some of them but not others. So as I read the report, the steps they didn't take were recommendations but not requirements, and they took the required steps. Well, I don't think there was any specific requirement. Well, not in the sense that it was required by some regulation or law, but that what the engineers told them, these are the things you need to do. Here are some things you could consider doing. Well, I think that even for the future ones, in order to prevent inevitability of structural damage, you need to take these particular steps that were not undertaken. The easier ones like a stairwell collapsing or having structural, visibly structural issues and those being corrected, sure, those were done. But like I said, the ones that had to do with the kind of, pardon me, the behind-the-scenes type issues were not done, and those were the ones that caused all the ultimate problems. So unless the Court has any other questions on fortuity, I just wanted to also point out that there are two exclusions, assuming that the Court disagrees with the District Court on the fortuity analysis, that the wear and tear and the settling, I always forget the name of that one, settling exclusions both apply given the facts and circumstances. The District Court didn't do that analysis, right? I mean, so we would be deciding for the first time whether, assuming that there's coverage of fortuity, that whether or not exclusions apply. So you are asking us to make that analysis on appeal. As an alternative ground to affirm the judgment below, this Court can do that. It's a legal issue, and we would submit that both exclusions apply in this case, even though the District Court didn't have to reach them, and we don't believe that this Court necessarily has to reach these issues as well, but they are alternative grounds for the Court. And unless the panel has any other questions, I'll submit. Thank you. All right. Thank you. Ada, you said two minutes? It's two minutes on the clock. All right. First of all, and Janko, quickly, only state in the country to apply reasonable foreseeability. We talked about why that standard would render insurance essentially illusory. But getting to the certainty, the purpose of fortuity, it is fraud. That is the purpose. That's why the standard has to be certainty. Not almost certainty, because that's risk, as I said earlier, and that's what insurance is all about. As far as repairs go, specifically, the repairs were, a final report was rendered on October 28, 2010, by the structural engineer that was originally hired. They hired a geologist to take a look at it called Speedy, and then they rendered a final report. And in the report, at ER 144, there's, in the conclusions and recommendations, and in the conclusions and the recommendations, there was nothing, nothing in there. And that's more important than what is in there. There was nothing in there that if star fisheries remained in there, it would affect the structural integrity of the building. Because remember, we're talking about fortuity. What they knew was absolutely going to happen. There was nothing like that. They did not suggest that star fisheries alter their conduct at all, that that would affect the structural integrity. In fact, they did not say that the structural integrity of that building had been compromised in any way. And the repairs, very quickly, the repairs you can see at ER 216, which is Mills-Brown Declaration, where he says, first of all, it's, again, a subjective standard. We had no idea the extent of this loss would have happened. And that's the focus, is the loss. It's not speculation. They have to know with certainty. Secondly, Mills-Brown sets out the repairs that were done. The options for prevention of future moisture infiltration were seal the cracks, put in a water coating ore, these are three options, or put in a water vapor system. The engineer at ER 202, Engineer Huseman, stated these were options. Any one of them would have been fine. In fact, at ER 9, the court sets out that these were options. It's undisputed that the cracks, the first option, was done. Undisputed, Mills-Brown's deposition. You can look at Louis Bozanich, who was the Vice President of Star Fisheries, who testified at ER 215 that all those repairs were done. The court states at ER 4 and ER 8 that the cracks were sealed. They did one of the options. But the bottom line on this is there's no other repairs, there's nothing else going on until 2022. And so for this court to find that this loss is not fortuitous, it has to find that based upon some repairs that were done in 2011, not told that the structural integrity of this building was going to collapse. Remember, it's a building, it's not just Star Fisheries, that somehow they're not told about anything that's improper with Star Fisheries. They're bestowed, endowed with knowledge to a certainty that their building is going to collapse between June 7, 2021 and June 7, 2022. With all due respect, it's not right. You're over time now. Wait a minute, did I only talk for 15 seconds? Thank you all very much, and thank you for coming into Phoenix. Thank you. Thank you both. Thank you both for your arguments this morning. They were very helpful, and this case is submitted. And we are adjourned until tomorrow morning.
judges: GRABER, TALLMAN, BADE